**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 09 CR 186-1 |
| v. | ) | |
| | ) | Judge Robert M. Dow, Jr. |
| CALVIN BOENDER | ) | |

**MEMORANDUM OPINION AND ORDER**

This opinion follows an *in camera* evidentiary hearing that was held on March 2, 2010, pursuant to Federal Rule of Evidence 104(a). The hearing was held to determine the admissibility at trial of certain communications between Defendant, Calvin Boender ("Boender"), and his prior attorneys, particularly communications with Attorney Daniel Reidy ("Reidy"). The Court held the hearing after concluding that, on the basis of a detailed proffer set forth in its briefs, the Government had made a threshold showing [see 117] that the crime-fraud exception to the attorney client privilege applies to the communications at issue. See *United States v. Zolin*, 491 U.S. 554, 566-68 (1989) (trial judge may conduct *in camera* hearing regarding the crime fraud exception; locating the authority in Fed. R. Evid. 104(a)); *In re Grand Jury Proceedings*, 220 F.3d 568, 571 (7th Cir. 2000) ("Only when the district court has been exposed to the contested documents and the specific facts which support a finding of privilege under the attorney-client relationship * * * can it make a principled determination as to whether the attorney-client privilege in fact applies").

The hearing lasted for several hours, during which time the Court allowed both parties the opportunity to present evidence and heard from three witnesses—Mr. Reidy, as well as two other lawyers who worked for Mr. Boender, Michael O'Connor ("O'Connor") and Victor Arana

("Arana").[1] The testimony at the hearing spoke to two outstanding motions *in limine* filed by the parties [86, 94]. Those motions, as well as the supporting and response briefs, have been carefully considered. The Court is now prepared to issue its rulings.[2]

For the reasons set forth below the Government's motion in limine "To Admit Evidence Concerning Document Production, or in the Alternative, to Conduct *in Camera* Inquiry" [86], is granted. Boender's motion *in limine* "To Exclude Any and All Testimony, Reference To Testimony, Argument Relating to Testimony, or Evidence Obtained Regarding Dan Reidy" [94] is denied. Boender's filings related to certain issues that are included in his motion are unsupported by evidence. Moreover, the evidence received at the *in camera* hearing indicates that the allegations directed toward Mr. Reidy and the Government attorneys are not well taken.

## I. The Government's Motion *in Limine* to Admit Evidence Concerning Document Production [86] and its Request Subsequent to the *in Camera* Hearing.

### A. Procedural Posture and the Government's Narrowed Request

The Government's motion *in limine* [86] sought to have provisionally admitted into evidence the following based on the crime-fraud exception: testimony by "Reidy, his colleague James Dunlop, *or any other person with knowledge* about the document production process * * * to explain how GJ 0000008 [an allegedly fraudulent invoice] came to be discovered, identified, duplicated and labeled as part of a batch of documents to be produced to the grand jury." Pl. Mot. at 4 (emphasis added). The Government also sought a ruling on the admissibility of

---

[1] Following the *in camera* hearing, the Court ordered the transcript of the proceedings to be sealed pending the Court's rulings on the privilege issues. See, *e.g.*, *A Sealed Case*, 890 F.2d 15, 15 (7th Cir. 1989) (noting that "[p]roceedings in the district court and this court have been conducted under seal to prevent the disclosure of confidences").

[2] To assist the parties in preparing for trial, which was scheduled to commence on Monday, March 8, the Court issued a minute order [148] on Friday, March 5, summarizing its rulings and indicating that a memorandum opinion and order further discussing the matters would be entered in due course. This is the opinion to which the March 5 order referred.

statements "made by defendant Boender to Mr. Reidy or Mr. Dunlop about [the invoice], specifically statements made for the purpose of transmitting the documents or communicating any information about the document to the government * * * [excluding] privileged communications made for the purpose of obtaining legal advice." *Id.*

In its post-hearing memorandum [141], the Government has put a finer point on the scope of its request. In particular, the Government has narrowed its request, singling out specific statements and interactions that fall within the Government's broader request. It now seeks to have provisionally admitted into evidence the following testimony, based on the crime-fraud exception to the attorney-client privilege:

- A late February 2008 conversation between Boender and Michael O'Connor regarding a folder of documents, including GJ 0000008 (the "invoice"), to be included in the documents collected in response to a grand jury subpoena;

- A February 25, 2008 conversation between Boender and Reidy regarding the existence of the invoice; and

- A February 27, 2008 conversation between Boender and Reidy, prior to Reidy's meeting with the Government, regarding the authenticity of the invoice.

In addition, as the Government did prior to the *in camera* hearing (see Pl. Mot. at 4, 10-11), it continues to seek a ruling on the admissibility of an e-mail from Dan Reidy to the Government, dated February 29, 2008. In the e-mail, Reidy stated that the invoice "was not prepared on or about the September 8, 2004 date it bears and was not sent to the named addressee." Pl. Mot., ex. 2 at 1. The Government contends that it should be allowed to offer the e-mail as an admission under Federal Rule of Evidence 801(d)(2)(D).

After the hearing, Mr. Boender filed a "Post Hearing Brief on Attorney-Client Privilege" [142], in which he continues to contend that the attorney-client privilege applies. Boender's motion expresses his "belie[f] that the testimony of Mr. Reidy [was] false." Def. Mem. at 3. The Court respectfully disagrees. As explained below, the evidence received at the hearing served only to strengthen the Government's showing that the crime-fraud exception applies in this case.

### B. The Crime-Fraud Exception to the Attorney-Client Privilege

The Government's motion invokes an exception to the attorney-client privilege known as the "crime-fraud exception." Federal Rule of Evidence 501 provides that, as a general matter, evidentiary privileges in federal courts are creatures of federal common law. Unless limited by the U.S. Constitution, an Act of Congress, or a Supreme Court Rule, privileges are "governed by the principles of the common law as they may be interpreted by the courts of the United States in light of reason and experience." Fed. R. Evid. 501. The Seventh Circuit looks to Proposed Rule of Evidence 503 "as a source of general guidance regarding federal common law principles." *United States v. BDO Seidman, LLP*, 492 F.3d 806, 814-15 (7th Cir. 2007) (quoting *In re Grand Jury Investigation*, 399 F.3d 527, 532 (2d Cir. 2005)). "Put simply, in order for the attorney-client privilege to attach, the communication in question must be made: (1) in confidence; (2) in connection with the provision of legal services; (3) to an attorney; and (4) in the context of an attorney-client relationship." *BDO Seidman*, 492 F.3d at 815. Where the attorney client privilege applies, the attendant opacity is stout and survives even the death of the client. *Swidler & Berlin v. United States*, 524 U.S. 399, 408-410 (1998).

The attorney-client privilege is paradoxical, however, in that its robustness is matched by its fragility. Although the attorney-client privilege is "of ancient lineage and continuing

4

importance," the privilege may be waived where due care is not taken with communications, such as through inadvertent disclosure. See *In re Sealed Case*, 877 F.2d 976, 980 (D.C. Cir. 1989); see also Paul R. Rice, ATTORNEY CLIENT PRIVILEGE IN THE UNITED STATES § 1.3 (2d ed. 2009) (privilege first appeared during the sixteenth century in order to protect the honor of the legal advisor). "The purpose of the privilege is to encourage full disclosure and to facilitate open communication between attorneys and their clients." *BDO Seidman*, 492 F.3d at 815 (quotation marks omitted). And although the privilege has an important place in our adversary system of litigation, "[t]he privilege takes flight if the relation is abused." *Clark v. United States*, 289 U.S. 1, 15 (1933) (Cardozo, J.).

One way in which a client may abuse the attorney-client relationship is by using the lawyer in order to further a crime or fraud. See, *e.g.*, *United States v. Zolin*, 491 U.S. 554, 562-63 (1989) (the privilege ceases "to operate at a certain point, namely when the desired advice relates *not to prior wrongdoing*, but to *future wrongdoing*"); *In re Sealed Case*, 754 F.2d 395, 402 (D.C. Cir. 1985) (crime-fraud exception where the unknowing representation and advice of counsel assisted the defendant in an attempted cover-up). "The privilege is not good in itself. * * * Secrecy is useful to the extent it facilitates the candor necessary to obtain legal advice. The privilege extends no further." *Matter of Feldberg*, 862 F.2d 622, 627 (7th Cir. 1988); *United States v. Hodge and Zweig*, 548 F.2d 1347, 1355 (9th Cir. 1977) (Kennedy, J.) ("[A] *quid pro quo* is exacted for the attorney-client confidence: the client must not abuse the confidential relation by using it to further a fraudulent or criminal scheme * * *."). Thus, as the Supreme Court has noted, the "established exceptions" to the attorney client-privilege, "such as the crime-fraud exception * * * are consistent with the purposes of the privilege." *Swidler & Berlin*, 524

U.S. at 409-10; see also *Glover v. Patten*, 165 U.S. 394, 406 (1897) (no exclusion for communications that "are not within the reason of the rule requiring their exclusion").

To invoke the crime-fraud exception, "the party seeking to abrogate the * * * privilege must present *prima facie* evidence that 'gives colour to the charge' by showing 'some foundation in fact.'" *BDO Seidman*, 492 F.3d at 818 (quoting *United States v. Al-Shahin*, 474 F.3d 941, 946 (7th Cir. 2007)).[3] If the challenging party meets this burden, the proponent of the privilege must "come forward with an explanation for the evidence offered against it." *Id.* If the Court finds the explanation "satisfactory," then the privilege remains. *Matter of Feldberg*, 862 F.2d 622, 626 (7th Cir. 1988). Otherwise, "the seal of secrecy is broken." *Clark*, 289 U.S. at 15; see also *Sound Video Unlimited v. Video Shack, Inc.*, 661 F. Supp. 1482, 1486 (N.D. Ill. 1987) (party seeking to abrogate the privilege must establish a connection between the "communications at issue and the alleged offense"). Notably, for the exception to the evidentiary privilege to apply, the Government is not required to show that a privilege holder actually succeeded in committing a crime; the wrongdoing "need only have been the objective of the client's communication." *United States v. Collins*, 128 F.3d 313, 321 (6th Cir. 1997); see also ATTORNEY CLIENT PRIVILEGE IN THE UNITED STATES § 8.2, at 25 & n.52 (collecting cases). Finally, it is the intent of the client, rather than the intent of the lawyer, that governs whether the crime-fraud exception applies. *In re Sealed Case*, 754 F.2d at 402.

---

[3] The Government's briefs on the pertinent motions set out a detailed evidentiary proffer of what it expects in the way of testimony at trial concerning the genesis of the invoice, principally on the basis of information gathered from Mr. Boender's business partner and bookkeeper. That testimony is based in part on matters within the personal knowledge of the witnesses and in part on statements that Boender is reported to have made to the witnesses. As the Court previously stated at the time that it set this matter for *in camera* hearing, the Government's evidentiary proffer was more than adequate "to give colour to the charge" and "raised questions sufficient to call for a careful inquiry in the district court." *Matter of Feldberg*, 862 F.2d at 625-26.

### C. Analysis

The Government's motion *in limine* [86], as narrowed by its post-hearing memorandum [141], is granted. In short, and although the ultimate issues are emphatically for the jury to decide, the Court concludes that there is sufficient evidence to conclude that Mr. Boender used his attorneys "as 'front men' in a scheme to subvert the judicial process." *In re Sealed Case*, 754 F.2d at 402 ("ancillary use of attorneys to assist in [a] fraudulent scheme" is not afforded the protection of the attorney-client privilege). Therefore, the attorney-client privilege will not shield disclosure of testimony sought by the Government.[4]

The testimony received by the Court during the *in camera* hearing supports the following conclusions: (1) Boender gave O'Connor (Boender's real estate lawyer) the invoice, stating that it was among additional documents that had been located and which were to be handed over along with four boxes of documents already in O'Connor's possession to the lawyers who would be advising Boender on criminal defense matters (Jones Day, the firm of which Reidy was (and is) a partner); (2) Boender told Reidy that he had an invoice, and understood that the invoice might be "helpful" in Reidy's efforts to convince the Government to treat Boender as a grand jury witness (and a victim) rather than a government target; (3) Reidy was assured by Boender that the invoice was authentic; (4) that the Government called the authenticity of the invoice into doubt after Reidy mentioned its existence in his hypothetical attorney proffer; after which (5)

---

[4] In view of the Court's determination that the attorney-client privilege is vitiated as to the communications sought by the Government and discussed in this opinion, the Court finds it appropriate to issue its ruling in the form of a public opinion. See, *e.g.*, *Hicklin Eng'g, L.C. v. R.J. Bartell*, 439 F.3d 346, 348 (7th Cir. 2006) (stating that "[a]ny step that withdraws an element of the judicial process from public view makes the ensuing decision look more like fiat and requires rigorous justification" and noting that opinions involving matters asserted to be state secrets have been issued publicly); *A Sealed Case*, 890 F.2d at 15 (releasing public opinion after holding proceedings under seal); *Siedle v. Putnam Investments, Inc.*, 147 F.3d 7, 12 (1st Cir. 1998) (explaining that materials claimed to be privileged need not remain "under permanent seal" and that unsealing is appropriate if the district court finds that the "claims of privilege are unsupported or that some applicable exception penetrates the attorney-client shield").

Reidy consulted with his client and other lawyers on the case and then turned over the document to the Government. Critically, the totality of the evidence, including that of the partner and bookkeeper, also supports the Government's contention that the invoice was fake and that Boender knew it to be fake when he gave the invoice to Reidy as part of Reidy's efforts to improve Boender's legal position with the Government.

1. **The Conversations**

    a. **The Late-February Conversation with O'Connor**

The Government seeks admission of a conversation in late February 2008 between Boender and O'Connor regarding a folder of documents, which included GJ 0000008, to be included in documents collected in response to grand jury subpoena.

Mr. O'Connor was called as a witness by Boender at the hearing. The direct examination and cross-examination of O'Connor reveal that it is unclear whether the statements involved would be privileged at the outset. In order for the attorney-client privilege to apply a communication has to have been made for purposes of obtaining legal advice. *BDO Seidman*, 492 F.3d at 815. O'Connor testified that he has, for extended periods of time including the present, served as Boender's commercial real estate lawyer. Mr. Boender brought some documents to O'Connor's office and the invoice was included with those documents. The documents were added to four boxes that were already in O'Connor's possession. O'Connor testified that Boender said that the additional documents were located while going through his office and that Boender thought that the documents were covered by the subpoena. It was O'Connor's understanding that the review of the files for purpose of ensuring compliance with the grand jury subpoena was to be performed by attorneys at the law firm Jones Day.

Even assuming that the communications to O'Connor were made for the purpose of obtaining legal advice,[5] the Court concludes that there is sufficient evidence to conclude that the statements were made in order to perpetrate a crime. In addition to the Government's threshold showing that led to the hearing, the evidence leading to that conclusion was provided by Mr. Reidy, after the Court directed him to answer questions at the hearing.

### b. February 25 Conversation Between Reidy and Boender

Reidy and Boender first spoke with one another on February 25. The two discussed having Reidy speak with the Government about Boender's "situation." The goal of the meeting was to have Mr. Boender treated as a witness who was a victim of extortion. Reidy stated that he believed that he was authorized by Boender to select favorable facts on behalf of Boender in order to place him in the best light with the Government. (Boender did not offer evidence refuting that grant of authority.) During the conversation, Boender told Reidy that the former had sent an invoice to Alderman Carothers. Reidy believed that the invoice could be "helpful" for Boender because it would have been consistent with Reidy's desire to portray Boender as a victim. Boender knew that Reidy was going to meet with the U.S. Attorney's Office on February 27. Mr. Boender wished Reidy "good luck" with respect to the meeting.

### c. February 27 Conversation Between Reidy and Boender

Before Mr. Reidy met with the Government, he saw both a copy and an original of an invoice. The latter stoked his suspicion, presumably because originals usually are sent to clients. (If Boender had the original invoice, it suggests that perhaps the invoice was never sent to

---

[5] As the Government points out, the communications between Boender and O'Connor concerning the documents that Boender had collected and directed O'Connor to provide to another set of lawyers (who turned out to be Jones Day) may well not have been privileged. See, *e.g.*, *Matter of Feldberg*, 862 F.2d at 627. The evidence suggests that Boender was not seeking legal advice from O'Connor in regard to the documents or their production – for example, as to whether certain documents (including the invoice) should be produced pursuant to the subpoena. To the contrary, O'Connor understood that Jones Day was to do that sort of review.

9

Carothers.) Reidy spoke on the phone with Boender on February 27, before Reidy's meeting with the Government.

Reidy expressed his concern to Boender that perhaps the invoice had not been sent. Boender responded that it had been sent. Reidy informed Boender that the document did not technically have to be handed over to the Government at this point because it was issued on the stationary of an entity that was not subject to a subpoena. At this point, Boender asked if the invoice helped him. Reidy said that it would help him if it was real. Boender said "What do you mean?" Reidy reiterated that if the document was real then it helped him, but he warned that it could "blow up" and result in an obstruction of justice charge and damage his underlying case if the invoice was fake. Boender stated that the invoice was "real." Reidy testified that the representation by Boender allayed his concerns.

Although O'Connor's testimony challenges Reidy's recollection, the Court concludes that Reidy's testimony was far more detailed and that Reidy had much greater cause to be focused on the invoice. Accordingly, the Court finds Reidy's recollection more credible and reliable. For example, although O'Connor testified twice that he gave the box of materials to Jones Day on the 26th, which he testified included the invoice, he also testified that it was not until February 27th (after the meeting with the Government), that Reidy asked O'Connor to see the invoice. The Court, having observed the testimony of both witnesses, concludes that the more credible testimony on that point was offered by Mr. Reidy.

    **d. The Meeting with the Government and the Subsequent Decision to Produce the Invoice**

When Reidy mentioned the invoice on February 27, the Government stated that it had reason to believe that the invoice was a fake. Reidy subsequently spoke with Boender and other lawyers on the defense team. The decision was made to tender the document and obtain the

Government's agreement to issue a separate subpoena for the document. Boender accepted Reidy's recommendation to produce the document.

Reidy's thinking was that he would turn over the document without attempting to obstruct justice by disclosing to the Government that the document was not what it purported to be. In other words, Reidy's advice to his then-client was to make an attempt to mitigate the damage that he felt may have been caused two days before.

\* \* \*

Based on the evidence and testimony received by the Court *in camera*, there is sufficient evidence to conclude, for purposes of establishing that the crime fraud exception applies, that Boender knew that the invoice was a fabrication, that he used his real estate attorney as a conduit to place the invoice among the boxes of documents that might be turned over to the Government, and then represented to his criminal defense attorney that the invoice was legitimate. Further, the evidence is sufficient to indicate Boender took those steps knowing that the criminal defense lawyer was meeting with the Government in an effort to place Boender's "situation" in the best possible light. Accordingly, the Court concludes that there is sufficient evidence to conclude that the conversations discussed above occurred not for the purpose of obtaining legal advice but for the purpose of perpetrating a crime in connection with the grand jury investigation of Boender. In addition, the evidence indicates that Boender knowingly allowed his attorneys to produce the document in an effort to mitigate any damage that may have been done at the February 27 meeting with the Government, accepting the advice of his experienced criminal defense counsel in that regard.

In sum, the Court concludes that "the evidence of guilt is ample * * * to break down the claim of privilege, and thus let in the light." *Clark*, 289 U.S. at 18. Similarly, the February 29,

11

2008 e-mail from Reidy to the Government will be deemed provisionally admitted under Federal Rule of Evidence 801(d)(2)(D).[6]

## II. Defendant's Remaining Motion *in Limine*

That leaves the converse side of the Government's motion *in limine*, which is Defendant's motion to have excluded at trial evidence that was procured either directly or indirectly through Attorney Daniel Reidy [94]. As a general matter, under some circumstances it is correct that improperly obtained evidence may be excluded via a pre-trial motion. See *United States v. Calandra*, 414 U.S. 338, 354 n.10 (1974). The Court need not sketch the contours of the right to have such evidence excluded at trial, however, because Boender has not shown that anything approaching misconduct occurred in this case.

Based on the analysis in Part I, Boender's motion *in limine* is denied. The motion itself, and its accompanying memorandum of law, advanced a story of what occurred between Reidy and the Government that is unsupported by any evidence. Moreover, the Court observes that the explanation offered by Reidy for why he turned over the document when he did, and for why he made the representation that he made in the February 29 e-mail, is consistent with Boender's theory of the case.[7] The Court expresses no opinion at this time on the viability of that position as a matter of law, but by Boender's own rationale, the crime of obstruction of justice would have been complete—or least farther along—had Reidy *not* made the representation that he did about the document's provenance in the February 29 e-mail. It is hardly self-evident that Mr.

---

[6] In view of the disposition of the Government's motion as set forth above, there is no need to consider the Government's alternative arguments concerning waiver of the attorney-client privilege as a result of Boender's accusations against his former lawyers.

[7] As Boender's attorney stated in response to Reidy's testimony as to his thinking, "I don't disagree with you on that."

Reidy deprived Boender of effective advocacy by operating under the same theory as Boender's current defense team.[8]

The Court concludes that the unsupported *in limine* motion by Boender is meritless as both a factual and legal matter and warrants no additional detailed discussion in light of the Court's analysis set forth in Part I above. In addition, the Court observes that the only evidence in the record supports the conclusion that Mr. Reidy acted professionally in his representation of Mr. Boender.[9] Finally, as there is absolutely no evidence that the Government violated anyone's rights, constitutional or otherwise, as they built their case against Mr. Boender, the Court rejects Boender's allegations of wrongful conduct by the prosecutors.

---

[8] It is worth mentioning as well that because the events at issue took place during the investigative phase of proceedings, it appears that any Sixth Amendment rights concerning effective assistance of counsel are not implicated. See *United States v. Gouveia*, 467 U.S. 180, 188 (1984).

[9] As the testimony shows that the decision not to seek "act of production" immunity was made on the recommendation of counsel, and was knowingly accepted by the client, the Court need not address Defendant's contentions that immunity should have been granted prior to the tender of the invoice to the Government.

### III. Conclusion

For the reasons set forth above, the Government's motion in limine "To Admit Evidence Concerning Document Production, or in the Alternative, to Conduct *in Camera* Inquiry" [86], is granted. Boender's motion *in limine* "To Exclude Any and All Testimony, Reference To Testimony, Argument Relating to Testimony, or Evidence Obtained Regarding Dan Reidy" [94] is denied. Boender's duplicative motion in limine "To Exclude Any and All Testimony, Reference To Testimony, Argument Relating to Testimony, or Evidence Obtained Regarding Dan Reidy" [90] is denied as moot.

Dated: March 8, 2010

_____
Robert M. Dow, Jr.
United States District Judge