**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CASE No. 09-cr-186-1 |
| | ) | |
| CALVIN BOENDER | ) | Judge Robert M. Dow, Jr. |
| | ) | |

**MEMORANDUM OPINION AND ORDER**

Before the Court is Defendant Calvin Boender's "Motion for New Trial, Judgment of Acquittal and Arrest of Judgment" [207]. The motion was brought pursuant to Federal Rules of Criminal Procedure 33 (new trial), 29 (judgment of acquittal), and 34 (arresting judgment). For the reasons set forth below, Defendant's motion is respectfully denied.

## I.      Background

On, March 18, 2010, a jury found Defendant guilty of five offenses under the laws of the United States [185]. Defendant was convicted of corruptly giving things of value to then-City of Chicago Alderman Isaac Carothers ("Carothers") in violation of 18 U.S.C. § 666(a)(2); making contributions in the name of another in violation of 2 U.S.C. §§ 441f, 437g(d)(1)(A)(ii); making contributions in excess of Federal Election Campaign Act limits in violation of 2 U.S.C. §§ 441a(a)(1), 437g(d)(1)(A)(ii); and two counts of corruptly endeavoring to obstruct the due administration of justice in violation of 18 U.S.C. § 1503(a).

## II.      Legal Standard

A motion for a new trial is brought pursuant to Federal Rule of Criminal Procedure 33. The Rule provides that the court "may vacate any judgment and grant a new trial if the interest of justice so requires." Newly discovered evidence is the only specifically listed basis in the rule (Fed. R. Crim. P. 33(b)(1)), although the rule allows for a new trial on "other grounds," so long

as the interest of justice requires it. See Fed. R. Crim. P. 33(b)(2). In this case, Defendant does not argue that he is entitled to a new trial based on newly discovered evidence. See also *United States v. Bender*, 539 F.3d 449, 455-56 (7th Cir. 2008) (four-part test for new trial based on newly discovered evidence). The Seventh Circuit has indicated that a motion for a new trial may be granted if there was insufficient evidence to support a conviction or if there were errors in evidentiary rulings, both of which Defendant argues. See *United States v. Christ*, 513 F.3d 762, 775 (7th Cir. 2008). Other appropriate bases have been recognized in other cases, if only implicitly at times. See *United States v. Hendrix*, 482 F.3d 962, 967 (7th Cir. 2007) (prosecutorial misconduct); *United States v. Taglia*, 922 F.2d 413, 417 (7th Cir. 1991) (ineffective assistance of counsel); *Brodie v. United States*, 295 F.2d 157, 160 (D.C. Cir. 1961) (Burger, J.) (recognizing that the bases for a new trial that are embodied in Fed. R. Crim. P. 33(b)(2) are broad, though counseling that they are "temperately to be utilized").

Federal Rule of Criminal Procedure 29 provides that the Court must grant a motion for a judgment of acquittal on "any offense for which the evidence is insufficient to sustain a conviction." Evidence is sufficient to sustain a conviction so long as a rational trier of fact, viewing the evidence in the light most favorable to the prosecution, "could have found the essential elements of a crime beyond a reasonable doubt." *United States v. Irby*, 558 F.3d 651, 653 (7th Cir. 2009); *United States v. Thornton*, 539 F.3d 741, 748 (7th Cir. 2008).

A motion to arrest the judgment is brought pursuant to Federal Rule of Criminal Procedure 34. The rule provides that the court must arrest judgment if "the indictment or information does not charge an offense." Thus, the rule raises a pure question of law distinct from the evidence adduced at trial. *United States v. McLemore*, 815 F. Supp. 432, 433 & n.3 (S.D. Ala. 1993) In this case, Defendant renews his contention, first raised in a motion to

dismiss, that 2 U.S.C. § 441f does not allow for convictions on a so-called "conduit contribution" theory.

## III.    Analysis

### A.    Attorney-Client Privilege Issues

Defendant's motion argues that the Court made several errors when it allowed his former attorneys, Dan Reidy and Michael O'Connor, to testify against him at trial.  The Court takes up each challenge below and concludes that each challenge is insufficient as a matter of law.

#### 1.    The Government made out a *prima facie* case that the crime-fraud exception to the attorney-client privilege applied.

Defendant first contends that the Government failed to marshal sufficient evidence to warrant a hearing on whether his communications with his lawyer, Dan Reidy ("Reidy"), fell within the crime-fraud exception to the attorney-client privilege.  Defendant maintains that, from the information before the Court, "[a]ll that could be reasonably concluded was that there were privileged conversations during an initial attorney-client interview."  Def. Mot. at 2.  The communications at issue involve what Defendant told Reidy about an invoice that purported to bill then-Alderman Carothers for work that was done on Carothers's home.  Evidence at trial supported the inference that Defendant created a false invoice and then lied to Reidy in an effort to thwart a grand jury investigation into Defendant's dealings with Alderman Carothers.

As a threshold matter, Defendant conflates the evidence adduced at the *in camera* hearing—including but not limited to the content of Defendant's initial conversation with Reidy—with the information that led the Court to order the *in camera* hearing in the first place. The overwhelming majority of Defendant's brief is devoted to advancing Defendant's gloss on the evidence that the Court heard at the *in camera* hearing; his brief does not focus on the information that was before the Court when it made its determination to hold the hearing.  Thus,

the majority of Defendant's arguments speak past the pertinent legal question, which is whether, at the time that the Court decided to hold an *in camera* hearing, the Government had "[brought] forth sufficient evidence to justify the district court in requiring the proponent of the privilege to come forward with an explanation for the evidence offered against it." *United States v. BDO Seidman, LLP*, 492 F.3d 806, 818 (7th Cir. 2007).

In a March 8, 2010 order [153] the Court fleshed out that question and elaborated on the case-law guideposts.[1] As the Court explained in the March 8 order,

> To invoke the crime-fraud exception, "the party seeking to abrogate the * * * privilege must present *prima facie* evidence that 'gives colour to the charge' by showing 'some foundation in fact.'" *BDO Seidman*, 492 F.3d at 818 (quoting *United States v. Al-Shahin*, 474 F.3d 941, 946 (7th Cir. 2007)). If the challenging party meets this burden, the proponent of the privilege must "come forward with an explanation for the evidence offered against it." *Id.* If the Court finds the explanation "satisfactory," then the privilege remains. *Matter of Feldberg*, 862 F.2d 622, 626 (7th Cir. 1988). Otherwise, "the seal of secrecy is broken." *Clark*, 289 U.S. at 15; see also *Sound Video Unlimited v. Video Shack, Inc.*, 661 F. Supp. 1482, 1486 (N.D. Ill. 1987) (party seeking to abrogate the privilege must establish a connection between the "communications at issue and the alleged offense"). Notably, for the exception to the evidentiary privilege to apply, the Government is not required to show that a privilege holder actually succeeded in committing a crime; the wrongdoing "need only have been the objective of the client's communication." *United States v. Collins*, 128 F.3d 313, 321 (6th Cir. 1997); see also ATTORNEY CLIENT PRIVILEGE IN THE UNITED STATES § 8.2, at 25 & n.52 (collecting cases). Finally, it is the intent of the client, rather than the intent of the lawyer, that governs whether the crime-fraud exception applies. *In re Sealed Case*, 754 F.2d at 402.

[153, at 6]. Thus, the first question that the Court had to address was the sufficiency of the Government's evidentiary proffer as set forth in its motion *in limine* [86]. Defendant made no challenge to the form that the proffer took. Prior to the hearing, the Government represented to the Court the following:

---

[1] The March 8 order is where the Court spelled out why certain evidence was provisionally admitted as non-privileged; on March 5, the Court stated what evidence would be admitted and promised an opinion in due course [148]; on February 22, the Court stated on the record [117] that the Government had made a sufficient showing to warrant an *in camera* hearing.

- Defendant told his partner, "I wish we had invoiced the Alderman back in 2004" [86, at 3].

- A document purporting to be an invoice to Alderman Carothers, Bates labeled GJ 0000008, was prepared on a typewriter. The document was dated September 8, 2004. However, the letterhead on the invoice was for a Defendant-run company, Historic Homes, that had been defunct since 2002 [86, at 3].

- According to Defendant's bookkeeper, the bookkeeper was the one who prepared the invoices for Historic Homes, not Defendant, and it was not the bookkeeper's practice to prepare invoices on a typewriter [86, at 3].

- Neither the bookkeeper nor Defendant's partner had ever seen GJ 0000008 [86, at 7].

- An expert who examined the typewriter and ribbons from Defendant's office suite was expected to testify that the corrective ribbon in the typewriter in April 2008 was used on GJ 0000008 (which, again, was dated four-years earlier) [86, at 8].

- Dan Reidy, Defendant's attorney, sent an e-mail to the Government stating that GJ 0000008 was not prepared on September 8, 2004, and stating that the invoice was never sent to Alderman Carothers [86, at 3].

Additional important information, particularly in terms of chronology and surrounding circumstances, came from Defendant's response to the Government's motion [106]. Before Reidy met with the Government, Defendant met with Reidy and told him that there was an invoice to Carothers [106, at 3]. Reidy then met with the Government. When Reidy told the Government that his client had an invoice, the Government informed Reidy that it believed that the document was a fake [106, at 3]. Reidy sent the e-mail to the Government only afterward.

Thus, at the time that the Court was deciding whether an *in camera* evidentiary hearing was warranted, the information before the Court was that the government had multiple witnesses—two associates of Defendant and one forensic expert—whose testimony suggested that GJ 0000008 was a fake and that Carothers was never invoiced for the work on his home. Defendant's own representation to the Court was that, prior to his lawyer's meeting with the Governement, Defendant told his lawyer that he had invoiced Alderman Carothers. That

information "gave colour to the charge" (*BDO Seidman*, 492 F.3d at 818) that Defendant had used his lawyer in an effort to get false documents to the Government and grand jury in an effort to help Defendant's case.

Again, under the Seventh Circuit case law, "*prima facie* evidence [of the crime-fraud exception] does not mean enough to support a verdict in favor of the person" who seeks the privilege's abrogation. *United States v. Davis*, 1 F.3d 606, 609 (7th Cir. 1993) (quotation marks omitted). In *Davis*, the defendant allegedly obstructed a grand jury investigation into former Cook County Sheriff James O'Grady. Davis was issued a subpoena for documents from his company (which allegedly had gotten business illegally). Davis's attorney, Lydon, met with an AUSA and presented a "completely innocent explanation for the relationship" between Davis's company and O'Grady. *Id.* at 609. More than five months after documents were produced pursuant to the subpoena, the Government learned that a document within the subpoena's ambit had not been turned over. *Id.* The omitted document indicated that Davis had "tricked Lydon into providing false information to a grand jury during an investigation" and the Seventh Circuit agreed that the conversations between Davis and Lydon in the course of that conduct were not privileged. *Id.* (brackets omitted).

Indeed, the information before the Court in this case significantly exceeded that which was before the district court in *Davis*, where the district court made its determination based on the fact and nature of a document that was omitted from a document production. In this case, there were multiple witnesses whose testimony supported the inference that Defendant produced a fake document, and Defendant's own representation in his pleadings to this Court say that he told his lawyer about the invoice (but not that it was fake) before the lawyer met with the Government. Therefore, the Court respectfully disagrees with Defendant's contention that "all

that could be reasonably concluded was that there were privileged conversations during an initial attorney-client interview." Def. Mot. at 2. The *raison d'être* of the crime-fraud exception is that the attorney-client privilege applies to efforts at seeking legal advice, but not to efforts at employing counsel to continue or initiate crimes. The Court reasonably concluded that Defendant may have purposely provided his lawyer with false information in the hopes of procuring favorable treatment from the Government and grand jury. The Seventh Circuit indicated in *Davis* that the "colour-to-the-charge" framework can be satisfied by a pale showing. See 1 F.3d at 609. The evidence with respect to Defendant was effulgent.

Defendant next argues that the communications with his lawyer could not be subject to the crime-fraud exception because there could have been no crime at the time the communications were made. Defendant's position rests on two mistaken notions: the first incorrect notion is that one seeking to abrogate the attorney-client privilege must present *prima facie* evidence of each element of a crime or fraud. The Seventh Circuit unambiguously teaches that the Government did not have to do so. *BDO Seidman*, 492 F.3d at 818-19 (concluding that such a requirement "is inconsistent" with the "colour-to-the-charge" framework); *Matter of Feldberg*, 862 F.2d 622, 625-26 (7th Cir. 1988) ("The question here is not whether the evidence supports a verdict but whether it calls for inquiry."). In any event, the crime-fraud exception is an exception for communications that occur as part of a crime or as part of future wrongdoing— the lie to the lawyer need not have been a crime by itself. See *Matter of Feldberg*, 862 F.2d at 626 (quoting 8 WIGMORE § 2298 (McNaughton Rev. 1961)); see also *United States v. Collis*, 128 F.3d 313, 321 (6th Cir. 1997) (question of whether the crime had been completed or not when the disputed communications took place "misses the point" of the crime-fraud exception); *Garner v. Wolfinbarger*, 430 F.3d 1093, 1102 (5th Cir. 1970) (communications made "during or

*before* the commission of a crime * * * for the purpose of being * * * assisted in its commission are not privileged" (emphasis added)).

Defendant's second mistaken notion is that the evidence indicated only that Defendant committed something called "anticipatory obstruction of justice" and that "anticipatory obstruction of justice" is not a crime. The Court made its determination that the Government had given "colour" to the charge that the crime-fraud exception applied based on the crime of obstruction of justice as defined in the United States Code. Title 18, Section 1503 of the United States Code makes it a crime to "corruptly * * * endeavor[] to influence, obstruct, or impede[] the due administration of justice." If Defendant falsified a document which he gave to his attorney in hopes of more lenient treatment as part of a grand jury investigation, then he committed obstruction of justice. *Aguilar v. United States*, 515 U.S. 593, 600 (1995) (indicating that an obstruction of justice conviction may be supported where FBI "agents acted as the arm of a grand jury" and false information was given to the agents). The fact that the document was not under subpoena (Def. Reply at 3) does not matter—the crime of obstruction is defined in terms of Defendant's "endeavors," not the grand jury's requests. Again, however, the entire discussion is academic, at least for purposes of the crime-fraud exception, because the Seventh Circuit has stated that the party seeking to abrogate the attorney-client privilege need not establish each element of a criminal charge. *BDO Seidman*, 492 F.3d at 818-19. So Defendant's argument "misses the point." *Collis*, 128 F.3d at 321.

As noted at the outset, many of Defendant's arguments address the sufficiency of the information that actually came out at the *in camera* hearing rather than the information that was made as part of the Government's *prima facie* showing. The gloss that Defendant puts on that information is at odds with the findings made by the Court which involved, among much else, an

evaluation of the credibility of witness testimony.  In particular, Defendant's motion implicitly

requests that the Court reject the testimony of Defendant's one-time criminal defense attorney,

Dan Reidy.  Instead, and again if only implicitly, Defendant asks that the Court accept several

inferences in favor of Defendant and accept the testimony of Defendant's long-time real estate

lawyer, Michael O'Connor ("O'Connor").  However, the Court already determined, as stated in

the March 8, 2010 order, that Reidy's testimony was more credible than O'Connor's [153, at 10].

Likewise, there was considerable evidence that Defendant sought to use Reidy to perpetrate a

crime.  The Court need not rehearse its prior analysis: for the reasons articulated in the March 8,

2010 memorandum opinion and order, the Court respectfully disagrees with Defendant's

contention that there was an insufficient basis to conclude that the crime-fraud exception applied

to Defendant's communications with Reidy.

> ### 2.  There was no error in allowing Michael O'Connor to examined or to be cross-examined regarding his communications with Defendant.

Defendant's next three arguments relate to the conduct of the *in camera* hearing that the

Court held.  According to Defendant, the Court erred, first, in allowing O'Connor to testify at the

*in camera* hearing.  Defendant also asserts that the Court erred by surprising Defendant with the

procedures that were used at the hearing.  Defendant's third argument is that the Court erred by

allowing the Government to attend the *in camera* hearing.  None of these arguments is

meritorious.

There are two inaccuracies in Defendant's brief that must be addressed at the outset.  The

first inaccuracy is Defendant's statement that he had no notice about the adversarial nature of the

hearing.  On February 22, 2010, when the Court granted the Government's request for an *in

camera* hearing, the Court said the following:

[W]hat I'm going to ask you guys to do—I guess based on what you guys have briefed, I would anticipate that Mr. Reidy would be—we would get some testimony from Mr. Reidy and then the defendant would get an opportunity to answer that, * * * then the government would have an opportunity to rebut since they really have the burden at the end of the day of trying to abrogate the privilege.

And I thought what we would do for that is we will do it *in camera*[.] [O]bviously, we will have [the court reporter] for that, and I would give you guys, it sounds like it will be pretty short, but * * * *you guys can put on the witnesses*, so to speak, *and cross-examine them*. I'm not sure I would have all the questions to ask and I think you guys could do a better job of presenting it for me so I have the full picture, which is what this is all about.

Hr'g Tr. 14-15, Feb. 22, 2010 (emphasis added). Defendant made no objection at that time to the Court's intended course of action. However, more than a week later, when the Court was about to allow counsel to begin putting on witnesses, Defendant objected for the first time that the hearing should be *ex parte* so that the Government would not get to hear any privileged communications. The Court stood by its prior decision to allow the parties to cross-examine one another's witnesses.

The second inaccuracy relates to how O'Connor came to testify. The argument caption in Defendant's brief reads "It Was Error to Allow Michael O'Connor to Testify Regarding His Communications with Defendant without Requiring the Government to Make a Prima Facie Showing * * *." However, O'Connor was *Defendant*'s witness. The decision to allow a cross-examination of O'Connor was just a logical consequence of Defendant's decision to call O'Connor as a witness at the hearing. Defendant knew that the cross-examination would occur on February 22, more than a week before the hearing.

Turning to the merits, Defendant argues that the Court should not have allowed O'Connor to testify (or, it would seem, to be cross-examined) at the hearing without a *prima*

*facie* showing that the crime-fraud exception applied. Besides the fact that O'Connor was Defendant's witness, the argument suffers from multiple flaws.

First, the examination (and cross-examination) of O'Connor did not reveal any privileged matter. As the Court noted in its prior order [153, at 8-9 & n.5], the evidence at the hearing indicated that Defendant did not seek legal advice from O'Connor in regard to GJ 0000008 or its production. See also *Matter of Feldberg*, 862 F.2d at 627 (concluding that the attorney-client privilege does not apply to questions to a records custodian such as "where did you look for the documents?" and ruling that, "[i]f the inquiry itself is legitimate, [a person] cannot put the subject off limits by having counsel turn over the documents"); *id.* (questions related to, for example, whether a document falls under a subpoena would be privileged). O'Connor was Defendant's real estate lawyer and just a conduit for the documents at issue—he provided no legal advice and there was no indication that Defendant was seeking any from O'Connor. As O'Connor testified, his understanding was that "[a]ttorneys at Jones Day" would "do the review of [Defendant's] files for the purpose of complying with any outstanding subpoenas * * *." Chambers Hr'g Tr. 122, Mar. 2, 2010 (direct examination of Michael T. O'Connor).

Second, the Government's motion seeking an *in camera* hearing sought to ensure the admissibility of testimony from "any person with knowledge about the document production process" related to "how GJ 0000008 came to be discovered, identified, duplicated and labeled as part of a batch of documents to be produced to the grand jury" [86, at 4]. The Court granted the motion for a hearing [117]. *A fortiori*, the determination with respect to Reidy that the Government had made a sufficiently colorable showing on the crime-fraud exception applied to O'Connor or any other of Boender's lawyers who conversed with Defendant about GJ 0000008 before it was handed over to the Government.

Third, by the time that O'Connor took the stand, there was additional "O'Connor-specific" evidence that the crime-fraud exception applied to communications Defendant might have had with O'Connor. (Although, as already mentioned, the hearing revealed that there were no privileged communications between O'Connor and Defendant in the first instance.) Specifically, Reidy testified (1) that O'Connor had a batch of documents (including GJ 0000008) prior to handing the documents over to Reidy (2) that Defendant knew Reidy was meeting with the U.S. Attorney's Office, (3) that Reidy warned Defendant that the GJ 0000008 could "blow up" his case if it were fake, (4) that Defendant provided assurances that GJ 0000008 was authentic, (5) that Reidy told Defendant that he intended to produce the document to the U.S. Attorney's Office, and (6) that Defendant wished Reidy "good luck" before the latter's appointment with the U.S. Attorney's Office. That meant that by the time that O'Connor took the stand, the Government had given "colour" to the charge that Defendant may have used communications with his lawyers, starting with O'Connor and continuing to Reidy, as part of an effort to commit a crime. The determination applied to O'Connor just as much as Reidy, because the documents were in O'Connor's hands just prior to Reidy's.

Moreover, based on Reidy's testimony alone, there was more than sufficient evidence to indicate that the crime-fraud exception applied—at least to the conversations between Defendant and Reidy. Calling O'Connor could only have helped Defendant—for instance if O'Connor's testimony showed that Defendant had attributed GJ 0000008 to someone else or stated that Defendant had back-dated an invoice but asked for O'Connor's advice on whether it should be produced. Such evidence would have suggested that Defendant had not intended to thwart a grand jury investigation and militate against finding that the crime-fraud exception applied, but

there were no such evidence, and no otherwise-privileged communications (with O'Connor) were revealed in any event.

Defendant next argues that it was error, under *U.S. v. Zolin*, 491 U.S. 554 (1989), to allow for an adversarial *in camera* hearing at which the Government was present. However, *Zolin* does not stand for the proposition that a district court must hold only *ex parte* evidentiary hearings whenever a party asserts a privilege. Rather, in *Zolin*, the Supreme Court held that the Federal Rules of Evidence do not bar *in camera* review of tapes to make a privilege determination. *Id.* at 565-66. To say, as Defendant argues, that *Zolin* either mandates (Def. Reply at 2 (*Zolin* established a "system")) or "contemplates" (Def. Mot. at 6) *ex parte* proceedings in all cases, "without open adversarial guidance by the parties," is to make an unsupported legal leap. The Government correctly notes that Defendant quoted the Supreme Court's opinion (considerably) out of context. See Gov't Resp. at 9. The Court merely noted that *in camera* review without the benefit of adversarial guidance would threaten to turn courts into unwilling agents of the parties—therefore the Court stated that parties must show that their requests for *in camera* review are justified. *Zolin*, 491 U.S. at 571. Indeed, the Supreme Court's opinion concluded that it was a mistake to treat communications between attorney and client as "presumptively privileged" when the court makes the threshold privilege determination under Federal Rule of Evidence 104(a). *Id.* at 567. Moreover, at least one case from this circuit indicates that allowing a party to appear *ex parte* to explain evidence as part of a privilege determination may be viewed skeptically. See *Natta v. Zletz*, 418 F.2d 633, 636 (7th Cir. 1969) (noting that an "evidentiary hearing" might have been "preferable" to in-court review in which party's counsel was allowed to make *ex parte* presentation of evidence); *cf.* also *Gen Contracting & Trading Co., LLC v. Interpole, Inc.*, 899 F.2d 109, 115 (1st Cir. 1990) (observing in the

context of a Fed. R. Civ. P. 12(b)(1) motion that in some instances it would be an abuse of discretion to rule on a cold record rather than using a "full evidentiary hearing").

All in all, the reported cases suggest that district courts enjoy significant discretion as to the procedures that they employ in making privilege determinations. For example, the Court might have allayed Defendant's concerns had it used procedures similar to those used in *In re John Doe, Inc.*, 13 F.3d 633 (2d Cir. 1994). (Defendant did not request any such procedures.) In *John Doe*, the court of appeals held that the district court did not err by conducting an *ex parte* hearing on the crime-fraud exception where the judge received a list of questions from prosecutors and then examined the lawyer-witness. In that case, the defendant contended that he should have been included at the hearing. See *id.* at 637.

Like *Zolin*, *John Doe* approves a particular procedure used by the trial court without mandating it. That flexibility-furnishing treatment is consistent with the general principle that trial courts are accorded wide discretion in addressing evidentiary matters. See, *e.g.*, *United States v. Saya*, 247 F.3d 929, 935 (9th Cir. 2001) (court was permitted but not required to hold evidentiary hearing on juror misconduct). And courts have in fact used and contemplated *in camera* hearings on matters of privilege, although the court acknowledges that concerns animating particular privileges may weigh in favor of particular procedures. In at least one case, the procedure used by the district court specifically stated that it allowed for cross-examination. See *United States v. Godkins*, 527 F.2d 1321, 1325 (5th Cir. 1976) (upholding trial court's decision to limit the cross-examination of a witness in an *in camera* hearing on the confidential informant privilege). In other cases, courts have referred to the appropriateness of holding *in camera* hearings on evidentiary matters without specifying that they would be, or should be, *ex parte* hearings. See *In re Grand Jury Subpoena*, 223 F.3d 213, 216, 219 (3d Cir. 2000) (in the

context of privileges asserted before the grand jury, district courts "may use *in camera* proceedings or *ex parte* affidavits" and further noting that there were multiple "avenues of inquiry" open to the district court); *Nixon v. Sirica*, 487 F.2d 700, 721 (D.C. Cir. 1973) (stating that after the assertion of a privilege, it may be appropriate, in addition to collecting documents and recordings for *in camera* inspection, to conduct an *in camera* hearing); *Aguinaga v. John Morrell & Co.*, 112 F.R.D. 671, 683 (D. Kan. 1986) (directing magistrate judge to hold a hearing rather than merely examine documents to determine if crime-fraud exception was applicable). Given the general unease with *ex parte* proceedings in the American justice system, it is logical and likely that the cases discussing *in camera* hearings would generally allow the default form of hearing in this country—*i.e.*, one in which both parties are present. "Ex parte proceedings are an exception to the rule in our judicial system and contrary to its adversarial nature." *In re High Sulfur Content Gasoline Prods. Liab. Litig.*, 517 F.3d 220, 231 (5th Cir. 2008).

The events at the *in camera* hearing in this case show the desirability of giving trial courts latitude in making privilege determinations. The procedure used in *Zolin* would not have worked because the critical evidence was not documentary or recorded, but testimonial. And the procedures used in *John Doe* were impracticable: the attorneys on both sides had superior knowledge of the facts surrounding the production of GJ 0000008, which facts allowed counsel for both sides to examine witnesses effectively—the lawyers were able to ask question (and then follow up questions) that would have required days of briefing, study, and preparation by the Court. Moreover, the Court did not perceive—nor did Defendant explain—a substantial risk that Defendant would be prejudiced if privileged communications were revealed at the *in camera* hearing. *Cf. Garner*, 430 F.2d at 1104 (courts may employ a variety of tools to protect

privileged information "where the impact of revelation may be as great as in revealing a communication with counsel").

Put simply, the procedures that the Court employed were those which the Court determined would be most effective and efficient given the facts of this case and the impending trial date, while still ensuring that the incidental revelation of privileged matters would not do harm to Defendant or his case. Were the facts different, or had Defendant offered a workable alternative, the Court might have employed a different procedure.

Finally, the Court observes that Defendant's arguments lose track of the Federal Rules of Criminal Procedure. As noted in Part II, *supra*, a new trial under Rule 33 may be warranted where the interests of justice require one. Defendant cites no case that stands for the proposition that a new trial may be warranted because a judge should (or should not) have conducted a pre-trial evidentiary hearing in a particular manner. The Seventh Circuit has directed trial courts not to grant motions for a new trial lightly. *United States. v. Santos*, 20 F.3d 280, 285 (7th Cir. 1994). Defendant has not showed that the Court committed error, much less that Defendant's substantial rights were affected.

### B. *Quid Pro Quo* and Federal Program Bribery

Although Defendant's argument captions (Def. Mot. 7, 8) indicate that he challenges the sufficiency of the evidence related to the federal program bribery count, his real dispute is with the jury instructions related to 18 U.S.C. § 666(a)(2), as is evident from his attempt to "incorporate by reference" his prior submissions on those jury instructions. See Def. Mot. at 7 n.1. His argument is that Section 666(a)(2) prohibits bribes but not gratuities. For reasons already explained to the parties, Defendant's argument is dead on arrival, at least for this Court. *United States v. Anderson*, 517 F.3d 953, 961 (7th Cir. 2008); see also *Sabri v. United States*,

541 U.S. 600, 605 (2004) (suggesting in dicta that the statute is even broader than the bribe/gratuity distinction and would extend to corrupt "general retainers"). In any event, the Court's jury instructions, like the pattern instructions, and like the statute, did not use the term "bribery" or "gratuity." Rather, the instructions tracked the language of the statute. In that, the Court perceives no error. *Byrd v. Ill. Dep't of Pub. Health*, 423 F.3d 696, 711 (7th Cir. 2005) (jury instructions "should not be patched together from snippets of appellate opinions taken out of context, but should rely first on the language of the statute").

## C.      The Jury Foreman

The Court denies Defendant's request for a new trial or, in the alternative, for an evidentiary hearing based on the *voir dire* responses of Juror No. 16, the jury foreman. Defendant has failed to make a colorable showing that Juror No. 16 gave false information, much less that Defendant could have been prejudiced by it.

This is Defendant's third attempt to gain access to a juror, and each time his request has been found lacking. First, Defendant sought to interview all jurors who were willing based on one juror's post-trial statement to a reporter that she was surprised that Alderman Carothers did not testify. The Court denied that motion [187]. Then Defendant sought to investigate the jury foreman based on his prior state-court jury service—which he disclosed during *voir dire*. After concluding that Defendant was seeking to use his post-trial motion as a general discovery device, the Court quashed Defendant's subpoena [206].

In the motion now before the Court, Defendant argues that a new trial or evidentiary hearing is needed because the jury foreman failed to disclose to the Court during *voir dire* that he had been involved in litigation against the City of Chicago or involved in "dealings" with the city. Because the evidence does not support Defendant's motion, his third attempt at juror access

must be denied as well.  As with Defendant's prior efforts, in denying the relief, the Court is mindful not only of Defendant's Sixth Amendment rights but also of the judicial system's interest in finality and ensuring that jurors remain free from harassing post-trial fishing expeditions.  See *Tanner v. United States*, 483 U.S. 107, 120-21 (1987) ("[F]ull and frank discussion in the jury room, jurors' willingness to return an unpopular verdict, and the community's trust in a system that relies on decisions of laypeople would all be undermined by a barrage of postverdict scrutiny of juror conduct."); *Remmer v. United States*, 347 U.S. 227, 229-230 (1954) ("A juror must feel free to exercise his functions without * * * anyone * * * looking over his shoulder.").

In balancing the competing concerns as they manifest in the context of allegedly dishonest *voir dire* responses, the Supreme Court has directed courts to employ a two-part framework for determining whether a new trial must be held.  See *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548 (1984).  In *McDonough*, a product liability case, the jurors were asked whether they or their family members had sustained "any severe injury * * * that resulted in prolonged pain and suffering."  One of the jurors did not respond to the question, but after the trial, Greenwood asserted "on information and belief" that the son of the juror "may have been injured at one time."  The district court did not allow Greenwood to interview the jurors.  *Id.* at 550.  Greenwood came back to the district court with an affidavit about the juror's son's application to join the Navy, in which the juror's son "stated that he had been injured in the explosion of a truck tire."  *Id.* at 551.[2]  At that point, the court allowed Greenwood to interview the juror, but subsequently denied a motion for a new trial.  In upholding the district court's decision, the Supreme Court held that in order to obtain a new trial for omissions during *voir dire*, "a party first must demonstrate that a juror failed to answer honestly a material question on

---

[2] The son's leg was broken.

*voir dire*, and then further show that a correct response would have provided a valid basis for a challenge for cause." *Greenwood*, 464 U.S. at 556.

Defendant's motion for a new trial contends that a new trial is required because the jury foreman failed to disclose that he was sued by the City of Chicago. Two *voir dire* questions furnish the foundation for Defendant's motion. Question number 15 read:

> Have you, or any close relatives or close friends, had any dealings with any City of Chicago departments or elected officials other than an Alderman or the Mayor? In this regard, I want you to think broadly about all of the different City of Chicago departments, agencies, and affiliations—and if you are unsure, please go ahead and mention the possible association with the City of Chicago. If so, what were those dealings? Is there anything about that experience that would affect your ability to be fair and impartial in your consideration of the evidence in this case?

Juror No. 16 did not respond to this question. The Court also asked jurors whether anyone had been "involved in litigation either against or as a defendant in a case brought by the City of Chicago?" Hr'g Tr. 53-54, Mar. 9, 2010. Again, Juror No. 16 did not respond to the question.

Against the anvil of the two questions, Defendant beats the following hammer in his effort to obtain a new trial:

> [Juror No. 16] was named as the defendant in a lawsuit filed by the City of Chicago in 1984. Redacted certified copies of the documents from that lawsuit are attached as Exhibit A. The records do not indicate that the foreperson was served with the lawsuit. However, it is reasonable to assume that the juror was we [sic] aware of the controversy with the City well before the City got around to filing a lawsuit.

Def. Mot. at 10. Although Defendant's primary request for relief is a new trial, he requests in the alternative that the Court hold an evidentiary hearing so that Juror No. 16 can be questioned about his involvement in the lawsuit and its impact, if any, on his jury service. In most cases, when there is evidence that a juror has given a dishonest answer during *voir dire*, the court should hold a hearing to determine if there was a dishonest answer and whether the complaining

party was prejudiced.  See *Arreola v. Choudry*, 533 F.3d 601, 605 (7th Cir. 2008); *United States v. Medina*, 430 F.3d 869, 877 (7th Cir. 2005); *United States v. Viezca*, 265 F.3d 593, 600 (7th Cir. 2001); *Marks v. Shell Oil Co.*, 895 F.2d 1128, 1130 (6th Cir. 1990) ("On a motion for an evidentiary hearing, any doubt must be resolved in favor of granting the motion, if the movant articulates a particular fact that would deny a fair trial."); *United States v. St. Clair*, 855 F.2d 518, 523 (8th Cir. 1988) (district court erred in failing to hold "*McDonough* hearing" where juror indicated no experience with explosives during *voir dire* but, in fact, had seven years of experience).

However, courts have not always required evidentiary hearings—both with respect to allegedly dishonest answers on *voir dire* and with respect to juror misconduct.  The predictable teaching from the cases is that an evidentiary hearing is not warranted where only scant evidence of dishonesty or misconduct has been presented.  See, *e.g.*, *United States v. Stewart*, 433 F.3d 273, 305-306 (2d Cir. 2006) (district court did not err in declining to hold hearing where juror failed to disclose recent $11,000 adverse judgment and information about juror's son's criminal record); *Marquez v. City of Albuquerque*, 399 F.3d 1216, 1223 (10th Cir. 2005) (district court not required to hold evidentiary hearing where *voir dire* question asked about juror's participation in training dogs rather than juror's *knowledge* about training dogs); *United States v. Quilca-Carpio*, 118 F.3d 719, 722 (11th Cir. 1997) (no error where trial judge declined to hold evidentiary hearing based on "speculative" evidence that juror was dishonest and conclusion that potential biases would have inured to defendant's benefit); *United States v. Williams*, 77 F.3d 1098, 1100 (8th Cir. 1996) (district court not required to hold evidentiary hearing where juror was asked if names of defendants "meant anything" to her and it was later learned that name of juror's grandson was the same); *United States v. Caldwell*, 776 F.2d 989, 998 (11th Cir. 1985) (the more

speculative the juror misconduct the less the trial court has the burden to investigate); *United States v. Moten*, 582 F.2d 654, 664 (2d Cir.1978) ("when *reasonable* grounds exist to believe that the jury may have been exposed to [an extraneous] influence, the entire picture should be explored" (emphasis added and quotation marks omitted)); *cf.* also *United States v. May*, 214 F.3d 900, 907 (7th Cir. 2000) (trial judge did not commit plain error by failing *sua sponte* to hold a hearing about whether a juror had given a dishonest answer based on an "ambiguous" note from the jury).

The Court concludes that Defendant is not entitled to a new trial or an evidentiary hearing. To begin with, Defendant has made only a cursory effort to establish that the person who was sued in the 1984 court filing attached to Defendant's motion was the same individual who served on the jury in this case. Moreover, if the Court accepts for present purposes (as does the Government) that the Lance Herion referenced in the 1984 court papers was the individual who served as Juror No. 16 in this case, the evidence that Defendant has offered indicates that Juror No. 16 was not dishonest during *voir dire*. Further, even indulging every assumption in favor of Defendant, the nature of the allegedly omitted information—in particular, the small-dollar amount of the lawsuit and the decades-long gap in time—does not support an inference that the juror was dishonest.

1.      **Lack of identity.**

It is necessary at this point to lay out the evidence that Defendant has lodged with the Court. The exhibits comprise several court documents—complaints, summonses, an empty docket sheet—that have the names blacked out. The Court will presume that the name on those forms is the name of Juror No. 16, Lance Herion.

According to a 1984 complaint filed by the City of Chicago, Herion failed to operate his motor vehicle in a safe manner and destroyed roughly $750 in property. The collision in question happened in December 1979, some thirty years before Defendant's trial. The return of service indicates that Herion was never served because he had moved in 1983 [207-1, at 7].

As an initial matter, Defendant has not offered the Court any corroborating evidence that the Lance Herion named in the 1984 lawsuit is the same Lance Herion who served as Juror No. 16. See, *e.g.*, *Marks*, 895 F.2d at 1130. The case law makes clear that a party is not entitled even to an evidentiary hearing, much less a new trial, on the basis of wisps of evidentiary smoke that contain no accompanying fire. If the name appeared in the documents based solely as a result of a name-based public records search, the Court would not allow further inquiry given the decades-long gap in time, at least not without knowing more about the frequency of the name Lance Herion. In *Marks*, the disappointed party was not entitled to an evidentiary hearing where a juror gave an answer about his employment history during *voir dire*. After trial, the employment could not be verified, but no evidentiary hearing was required because there was no showing that the employment records that had been located (which did not corroborate the juror's story) were reliable, nor was there any showing that the juror had in fact worked elsewhere. 895 F.2d at 1130. Similar to *Marks*, given the temporal gap, Defendant's name-based showing is insufficient. As discussed below, however, the far more serious deficiency is that there is no evidence that Juror No. 16 omitted anything from his *voir dire* responses.

>  ### 2. Even assuming identity, lack of dishonesty precludes both a new trial and an evidentiary hearing.

Even assuming that the Lance Herion from Defendant's exhibit is Juror No. 16, there is no indication that Juror No. 16 provided a dishonest answer to the Court during *voir dire*. In his brief, Defendant asserts that "[t]he records *do not indicate* that the foreperson was served with

the lawsuit" (emphasis added)—thus implying that the record is silent. But that is not accurate. In fact, the only evidence indicates affirmatively that Herion was not served with the City's complaint because he had moved one year before the City filed suit. That means that Juror No. 16 was never "involved' in litigation against the City of Chicago, because he never knew about it. And even if a person can unknowingly be "involved" in litigation, any failure to speak-up was, by definition, honest.

The analysis does not change because Juror No. 16 would have been aware of the accident itself. The Court would not have expected Juror No. 16 to raise his hand after the Court asked the jurors if they had been involved in "dealings with any City of Chicago departments or elected officials." That question was plainly aimed at soliciting responses about business dealings and/or significant interactions with city personnel or officials. The most that can be said based on the complaint is that Herion may have had a literal run-in with some of the City's property. It would not have aided the Court in selecting in impartial jury if the Court took testimony from every potential juror who had thirty-year old parking tickets, or fender benders involving city property, or trips to city hall to get zoned permit parking stickers. Although the Court asked potential jurors to think broadly about their interactions with the City, the Court did not ask the jurors to be all-inclusive. Had jurors started to offer *de minimis* encounters, at some point the Court would have told the venire that they were thinking a bit too broadly. In short, nothing in the language used in the question would have put Juror No. 16, or anyone else, on notice that a thirty-year old traffic incident would have been considered a "dealing" with a city agency, its personnel, or its officers. *Robinson v. Monsanto Co.*, 758 F.2d 331, 335 (8th Cir. 1985) (in making determination about dishonesty, court should look to the directness of the question). Moreover, a new trial under *McDonough* is not warranted where an answer is honest

but mistaken. *Pope v. Man-Data, Inc.*, 209 F.3d 1161, 1164 (9th Cir. 2000). Even assuming that Juror No. 16 knew that he had been sued (this after assuming that Juror No. 16 is in fact the Lance Herion named in the suit), the relatively small size of the claim for relief and the fact that the underlying alleged tort took place more than thirty years ago suggest that any omission was not intentional. *Stewart*, 433 F.3d at 305 n.7.

But again, the only evidence that the Court has been presented with indicates that Juror No. 16 was not served with the summons in question—no omission and no dishonesty. That means that Defendant is foreclosed as a matter of law from his attempt to gain a new trial. See *Pope v. Man-Data, Inc.*, 209 F.3d 1161, 1163 (9th Cir. 2000). In *Pope*, a panel of the Ninth Circuit ruled that a magistrate judge erred in ordering a new trial where jurors were asked whether they had been involved in a "significant dispute" with a collection agency. The juror whose *voir dire* answers were subsequently called into question offered no response, but it was later learned that the juror had three default judgments entered against her—one for a dishonored check and two in suits against collection agencies. The Ninth Circuit ruled that the judge erred in its *McDonough* analysis in ordering a new trial because it was not enough to show that it was plausible that a juror gave a dishonest answer: on those fact, an evidentiary hearing was necessary. *Pope*, 209 F.3d at 1163; see also *Viezca*, 265 F.3d at 600-601 (upholding trial court's determination after an evidentiary hearing); *United States v. Tucker*, 137 F.3d 1016, 1027 (8th Cir. 1998) (no new trial under *McDonough* where evidence of juror dishonesty and bias was "only circumstantial"). In addition, Defendant's motion fails step-two of *McDonough* because the omitted information in this case—a thirty year old traffic incident that damaged city property—would not have supported a challenge for cause. See 464 U.S. at 556. There were other members of the jury pool with more extensive (and undoubted) dealings with city

personnel and officials, including aldermen.  Although Defendant correctly points out that he had the opportunity to ask follow-up questions of these jurors during *voir dire*, the omitted information (not answers to follow-up questions) must provide the basis for the for-cause challenge under *McDonough*, and the fact that there were similarly situated members on the jury cuts against Defendant's challenge.

Thus, the only question is whether Defendant is entitled to an evidentiary hearing.  The Court concludes that Defendant is not entitled to such a hearing.  As discussed above, even if Defendant had convincingly established that the Lance Herion in the 1979 incident and 1984 lawsuit was the same Lance Herion who served as Juror No. 16 in this case, the evidence before the Court indicates that Juror No. 16 provided the Court with honest answers during *voir dire*. The facts of the case stand in stark contrast to those in which appeals courts have concluded that an evidentiary hearing was warranted.  See, *e.g.*, *Tucker*, 137 F.3d at 1026-27 (8th Cir. 1998) (evidentiary hearing required where juror did not answer question about whether any family member had been charged with a crime, and it was learned that her husband had been convicted); *Vezina v. Theriot Marine Serv., Inc.*, 554 F.2d 654, 655-56 (5th Cir. 1977) (evidentiary hearing required where it was undisputed that juror was involved in a half-million dollar lawsuit and juror reportedly said prior to *voir dire* that suits like plaintiff's "were good for nothing except to raise everyone's insurance rates").  The facts here fit far more comfortably with those cases where courts have concluded that no hearing was necessary.  See *ante* at 20; *Robinson*, 758 F.2d at 334-35 (no evidentiary hearing required where juror's real estate office had significant dealings with defendant's employees and jurors were asked only general questions about whether they believed anything about their employment would hinder impartiality); *Marks*, 895 F.2d at 1130 (juror said as part of *voir dire* that he had worked for a predecessor of Marathon Oil, but

losing party could not verify the employment history; no evidentiary hearing because there was no evidence that the records were reliable or that the juror had in fact worked elsewhere).

The trigger for an evidentiary hearing is a "colorable showing" that the juror lied or was biased. *Pope*, 209 F.3d at 1163. That trigger was not squeezed by Defendant's submission; therefore, Defendant's request for an evidentiary hearing is respectfully denied. Defendant's motion and supporting materials were insufficient in that they fail to establish the identity of the person named in the lawsuit in question and, more importantly, indicate that Juror No. 16 acted honestly. Thus, Defendant cannot obtain an evidentiary hearing based on Juror No. 16's non-response during *voir dire*. *Stewart*, 433 F.3d at 305 (considering only the two omissions that the defendant had properly supported among several omissions that he had offered).

### D. Conduit Contributions and 2 U.S.C. § 441f

Finally, Defendant renews his argument that no conviction was possible under Count II of the redacted indictment (Count VI of the legally operative indictment) because 2 U.S.C. § 441f does not prohibit so-called "conduit contributions." As the Court noted in the February 4, 2010 order denying Defendant's motion to dismiss, there had been a single district court decision in California in which an indictment had been dismissed based on Defendant's theory [121, at 12 n.5]. Last week, however, the United States Court of Appeals reversed the district court in that case. See *United States v. O'Donnell*, --- F.3d ----, 2010 WL 2352042 (9th Cir. June 14, 2010). For the reasons expressed in that case, as well as the authorities in the Court's prior order, the Court denies Defendant's request to arrest the judgment with respect to Count II.

## IV.   Conclusion

For the reasons set forth above, Defendant's motion for a new trial, judgment of acquittal and arrest of judgment [207] is respectfully denied.

Dated:  June 21, 2010

_____
Robert M. Dow, Jr.
United States District Judge